# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DENTSPLY SIRONA INC.,** | : | **CIVIL ACTION NO. 1:17-CV-1530** |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| **NET32, INC.,** | : | |
| Defendant | : | |

## MEMORANDUM

Before the court is a motion (Doc. 2) for preliminary injunction filed by plaintiff Dentsply Sirona Inc. ("Dentsply") against defendant Net32, Inc. ("Net32"). For the reasons that follow, the court will deny Dentsply's motion.

I.  **Background**

Dentsply commenced this action with the filing of a complaint (Doc. 1) for injunctive and other relief on August 25, 2017. In its complaint, Dentsply asserts three counts under the Lanham Act against Net32: contributory trademark infringement under 15 U.S.C. § 1114 (Count I); contributory federal unfair competition, false description, and false designation of origin under 15 U.S.C. § 1125(a) (Count II); and contributory trademark dilution under 15 U.S.C. § 1125(c) (Count III). (Doc. 1).

Dentsply seeks preliminary injunctive relief based on two of its Lanham Act claims—Counts I and II. (Id.) The parties filed multiple briefs in support of their respective positions. (Docs. 3, 24, 29, 37-2). The court convened a preliminary injunction hearing on November 2, 2017, taking evidence in the form of documentary

exhibits and witness testimony. (See Doc. 25). The parties filed proposed findings of fact and conclusions of law in support of their respective positions subsequent to the hearing. (Docs. 49, 50). With briefing concluded and the record closed, Dentsply's motion for preliminary injunction is ripe for disposition.

## II. **Findings of Fact**[1]

Dentsply manufacturers a range of professional dental supplies and equipment. (Tr. 13:12-19). It has been in business for over 100 years and its products are sold in the United States and abroad. (Id. at 13:22-23, 16:25-17:1-3). Dentsply products sold in the United States are generally priced at a higher, or premium, price point as compared to those sold overseas. (Id. at 16:12-15, 27:1-9). Dentsply utilizes a network of authorized dealers to sell its wares within the United States. (Id. at 14:7-17). These authorized dealers, together with Denstply's salesforce, provide customer support as needed. (Id. at 14:18-16:11, 17:4-18, 17:22-18:12). Understandably, Dentsply provides less customer support for goods purchased outside of its authorized network of dealers. (Id. at 18:9-24, 21:1-18). Dentsply requires its authorized distributors to enter into "Distributor Agreements." (See id. at 24:21-25, 25:19-21; see also Dentsply Ex. I.4).

Former dentist Patrick Cassidy ("Dr. Cassidy") and his wife founded Net32 to enable dentists to compare prices before purchasing dental supplies. (Tr. 97:18-19,

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the record. Citations to the record include, *inter alia*, the transcript of the preliminary injunction hearing convened on November 2, 2017 ("Tr."), as well as exhibits introduced by Dentsply ("Dentsply Ex.") and Net32 ("Net32 Ex.").

2

111:8-112:4). Net32 is an online marketplace for dental products that provides a forum for sales transactions between consumers and sellers. (Id. at 22:11-22). Dentists typically utilize the website to compare prices between Net32's vendors, which include dealers and manufacturers of dental supplies. (Id. at 112:9-22). Net32 facilitates sales transactions between its vendors and consumers, but orders are "invoiced and shipped" by the individual vendors rather than by Net32. (Id. at 22:14-22, 124:17-21).

Net32 does not physically inspect any of the items sold on its website. (See id. at 22:19-22, 129:2-12). Customers may file complaints directly with Net32 if they are unhappy with a product upon receipt. (See id. at 112:23-113:16). Net32 requires vendors to enter into a "Sales Representative Agreement," otherwise known as a listing agreement. (See id. at 124:15-25, 130:17-132:3; see also Net32 Exs. 1-2). The agreement mandates, among other things, that vendors list goods for sale that are approved by the United States Food & Drug Administration ("FDA"). (Tr. 124:22-125:1). Net32 recently revised its listing agreement, and it has been using the revised agreement with certain vendors effective October 2017. (Id. at 131:17-24).

Dr. Cassidy estimates that approximately 54,000 Dentsply products have been sold on Net32's website since September 2015. (Id. at 114:23-115:3). Net32's vendors sell Dentsply merchandise at discount prices, but Net32 and the majority of its vendors are not authorized distributors for Dentsply. (See id. at 23:22-24:20, 26:24-27:5; see also Dentsply Ex. I.5; Doc. 24-8). Most of these discounted items are intended for sale outside of the United States, though Dentsply is unaware of how

3

Net32's vendors acquire these "gray market goods."[2] (See Tr. 27:6-14, 28:13-17). Nonetheless, Dentsply has known since at least 2011 that unauthorized dealers sell Dentsply products either manufactured abroad or intended for sale abroad on Net32's website. (See id. at 29:1-17, 59:15-60:11; Doc. 24-8). And for at least five years, Dentsply has known that some of these products are different from those authorized for sale in the United States. (Tr. 63:4-19, 66:19-67:11, 69:17-24).[3] Those differences are, to wit: the quantity of items available per package, missing or illegible source codes, customer support information, packaging denoting that the item is intended for sale outside of the United States or identifying an unauthorized dealer, and packaging that is defaced or different in coloring.[4] (See id. at 33:10-35:1,

---

[2] A gray market good is a "foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 285 (1988). Gray market goods are "neither counterfeit goods nor goods masquerading as genuine by adopting confusingly similar marks; they use the actual marks and the marks are lawfully affixed to them." Novartis Animal Health US, Inc. v. Abbeyvet Export Ltd., 409 F. Supp. 2d 264, 266 (S.D.N.Y. 2005).

[3] The preliminary injunction motion identified four products. (See Tr. 37:17-38:8; Doc. 3 at 5-6). Dentsply identified additional products in subsequent briefing and at the hearing. (See Doc. 29 at 6-9; see also Tr. 46:9-51:7). The court will consider all products identified by Dentsply over Net32's objection for purposes of the instant motion. (See Tr. 37:17-38:18, 46:9-51:7).

[4] Dentsply identified a lack of FDA approval as an additional difference for three products: the Spectrum TPH-3, Dyract, and Dycal. (See Tr. 35:10-13, 91:4-24, 121:18-22, see also Doc. 50 ¶ 194). We need not determine whether the lack of FDA approval is sufficient to establish a material difference in the context of trademark infringement at this juncture because the current record, including post-hearing briefing, establishes that these products are no longer available for sale on Net32's website. (See Tr. 40:16-41:13, 122:8-18, 125:6-12; see also Doc. 49 ¶ 295; Doc. 50 ¶¶ 194-95).

35:24-37:9, 41:23-42:9, 43:24-45:23, 49:20-51:6, 51:14-52:25; see also Dentsply Exs. I.11-13, I.15-17).

Dentsply did not approach Net32 about these differences until September 2016 and did not explain how these differences constituted trademark infringement. (See Tr. 120:10-19; see also Doc. 2-1 at 12-14, 133-34, 256-58, 382, 390-91; Doc. 24-14; Doc. 24-15; Doc. 24-16; Doc. 24-18; Doc. 24-22; Doc. 24-24). Rather, the parties engaged in a series of correspondence between September 2016 and March 2017 about possible infringement in the abstract. (See Doc. 2-1 at 12-14, 133-34, 256-58, 382, 390-91; Doc. 24-14; Doc. 24-15; Doc. 24-16; Doc. 24-18; Doc. 24-22; Doc. 24-24). Net32 expressly invited Dentsply, in nearly all of its correspondence, to explain the reasoning behind the accusations of possible infringement, but Dentsply merely reiterated its demands without elaboration. (See Doc. 2-1 at 12-14, 133-34, 256-58, 382, 390-91; Doc. 24-14; Doc. 24-16; Doc. 24-18; Doc. 24-22; Doc. 24-24). According to Dentsply, it purposefully delayed the initiation of litigation against Net32 until 2017, pursuant to its "legal strategy." (Id. at 73:5-74:2).

To date Dentsply has identified three vendors that sell its products through Net32's website despite the differences outlined above: "Dental Wholesale Direct" (also known as "Dental Brands for Less"), "River Dental," and "Tradent Supply." (See Tr. 29:14-31:17, 38:24-40:20, 43:10-46-7, 50:6-51:7; see also Dentsply Exs. I.11-13, I.15-17). In 2015, Dentsply filed a direct infringement lawsuit against Dental Wholesale Direct. (Id. at 30:17-24, 72:16-18). At present, Dentsply has not sought injunctive relief against Dental Wholesale Direct. (Id. at 72:25-73:16).

5

Dentsply maintains two indexes of customer information. (See id. at 20:1-22, 53:1-9, 54:23-55:13). The first, "Trackwise," is a database of customer complaints that can be searched by topic, such as those related to gray market goods. (Id. at 53:1-9, 54:23-55:13; see also Dentsply Exs. IV.2-30). Approximately 2,500 customer complaints are added to the Trackwise index each month. (Doc. 44-1, Helen Lewis Dep. 27:10-13 (October 30, 2017)).[5] Of 29 gray market good complaints dated May 2010 to August 2016, one references Net32 and a second refers to Net31. (Tr. 53:10-56:4, 84:3-19). Neither one suggests confusion among Net32's customer base, which consists of mostly dentists. (See id. at 78:4-79:5, 84:16-22). The second database, called "SIEBEL," is an index of transactional records, namely the purchasing history of various dental offices. (Id. at 20:9-22, 21:19-22:8). Entries in SIEBEL that reference Net32 do not indicate consumer confusion. (See id. at 86:23-88:17; see also Net32 Ex. 34).

Net32 also maintains customer complaint records. (See Tr. 115:4-12; see also Dentsply Exs. II.1-16). In September 2015, Net32 started tracking and documenting customer complaints of "suspected non-genuine products." (Tr. 115:4-12; see also Dentsply Exs. II.1-16). Net32 works directly with vendors upon receipt of feedback related to suspected non-genuineness. (Tr. 120:20-122:7, 123:7-14). There are approximately 28 entries related to Dentsply products listed in Net32's index. (Id. at 115:9-20; see also Dentsply Exs. II.1-16). Some of these entries relate to wrongful

---

[5] Corporate Director of Regulatory Affairs at Dentsply, Helen Lewis ("Ms. Lewis"), did not testify at the hearing due to time constraints. (See Tr. 94:14-16). The parties stipulated to the court's consideration of designated portions of Ms. Lewis's deposition testimony in lieu of her live testimony. (Tr. 94:17-96:8).

6

substitution by vendors—that is, when vendors send "the wrong genuine product to replace another genuine product"—rather than differences between products. (Tr. 115:21-116:13). In certain instances, Net32 will delist a vendor or a specific product from its website. (Id. at 121:11-22, 122:8-18, 126:24-127:5). Net32's customers post reviews of products on Net32's website. (Id. at 116:24-117:2). The majority are positive. (Id. at 117:10-15).

## III. <u>Legal Standard</u>

The court applies a four-factor test in determining the propriety of preliminary injunctive relief. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." <u>Id.</u> This showing must be "significantly better than negligible but not necessarily more likely than not." <u>Id.</u> The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. <u>Id.</u> Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief. <u>Id.</u> at 176, 179. The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief. <u>Id.</u> at 179.

## IV. Discussion

### A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. See Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980). The court must examine the legal principles controlling the claim and the potential defenses available to the opposing party. See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000). A mere possibility that the claim might be defeated does not preclude a finding of probable success if evidence clearly satisfies the essential prerequisites of the cause of action. Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001). A showing that is "significantly better than negligible but not necessarily more likely than not" is sufficient to obtain preliminary injunctive relief. Reilly, 858 F.3d at 179. The requisite strength of a claim on the merits depends ultimately on the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." Id.

A manufacturer or distributor can be held contributorily liable for the direct infringement activities of another if they continue to supply their product to one whom they know or have reason to know is "engaging in trademark infringement." AT&T v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1432-33 (3d Cir. 1994) (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54 (1982)). The

8

merits analysis thus requires Dentsply to establish two elements: (1) trademark infringement by Net32's vendors and (2) knowledge of the infringement by Net32.[6]

### 1. *Infringement by Net32's Vendors*

Claims for trademark infringement and unfair competition share the same essential elements under the Lanham Act. See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); Harp v. Rahme, 984 F. Supp. 2d 398, 409-10 (E.D. Pa. 2013). To prevail on either claim, a plaintiff must establish that (1) the marks in dispute are valid and legally protectable; (2) plaintiff owns the marks; and (3) defendant's use of a similar mark generates "a likelihood of confusion." A&H Sportswear, 237 F.3d at 210. The parties do not dispute that Dentsply has sufficiently demonstrated ownership and validity of the Dentsply marks for purposes of a preliminary injunction. (See Tr. 6:4-14; see also Doc. 50 ¶¶ 243-65). Hence, the court need only determine whether Dentsply has shown that its products sold on Net32's website are "materially different" such that they are likely to cause confusion amongst consumers.

The traditional Lapp factors, used to determine whether there is a likelihood of confusion in standard trademark infringement case, are inapplicable in the gray

---

[6] Both parties urge the court to consider a third factor, developed by courts outside of the Third Circuit, to determine whether Net32, as an online marketplace, is contributorily liable for the alleged infringement of its vendors. (See Doc. 49 ¶¶ 277-78; Doc. 50 ¶ 243). The third factor is whether Net32, upon learning of its vendors' infringement, took "reasonable remedial measures" to stop the infringement. See 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1249 (10th Cir. 2013); Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 105-07 (2d Cir. 2010). As discussed further *infra*, the present record does not establish that Net32 knew or had reason to know that its vendors were engaging in trademark infringement, rendering an analysis of Net32's subsequent actions irrelevant.

9

market good context.  See Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983) (citing Scott Paper Co., 589 F.2d at 1229).  Rather, the relevant question is whether or not the products sold by the alleged infringer are "genuine."  Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302-03 (3d Cir. 1998).[7]  A product is considered genuine if there are no "material differences" between the product sold by the trademark owner and the product sold by the alleged infringer.  Id.

Differences may be considered material if they are "likely to damage the goodwill developed by the trademark owner in the trademarked goods."  Id.  When the trademark owner and the alleged infringer sell materially different products that bear identical marks, consumers are likely to be confused about the "quality and nature" of the trademarked good.  Id.  But when the differences between the products are "so minimal" that consumers who purchased from the alleged infringer get "precisely what they believed they were purchasing," id. at 303 (quoting Weil Ceramics and Glass, Inc. v. Dash, 878 F.2d 659, 672 (3d Cir. 1989)), the goods may be considered genuine and there will be no liability under the Lanham

---

[7] Dentsply entreats the court to apply a two-element test adopted by the Second Circuit to establish likelihood of confusion where gray market goods are at issue.  (See Doc. 49 ¶¶ 203).  That test sets forth that a likelihood of confusion is present if: (1) the goods were not intended to be sold in the United States, and (2) they are materially different from the goods typically sold in the United States.  Novartis, 409 F. Supp. at 266 (citing Original Appalachian Artworks, Inc. v. Granada Electronics, Inc., 816 F.2d 68, 73 (2d Cir. 1987)).  The Third Circuit has not adopted the first element of the test, but rather has held that the relevant question, stated *supra*, is the same regardless of whether the good was originally intended for sale outside of the United States or not.  See Iberia Foods, 150 F.3d at 302-03.  In light of Iberia Foods and testimony at the hearing, the court will focus its analysis on genuineness.  (See Tr. 5:16-18, 70:14-23).

10

Act for the alleged infringer, id. at 303-04. There is no exhaustive list of differences that may be considered material for purposes of the "genuineness test." Id. at 304.

Dentsply has adduced abundant evidence in support of its argument that the differences between Dentsply products authorized for sale in the United States and those sold on Net32's website are material. (See Tr. 33:10-35:1, 35:24-37:9, 41:23-42:9, 43:24-45:23, 49:20-51:6, 51:14-52:25). This evidence may ultimately be sufficient to establish that certain Dentsply products sold on Net32's website are not genuine. See Iberia Foods, 150 F.3d at 304. Nonetheless, assuming *arguendo* that these items are not genuine, we conclude *infra* that Dentsply has failed to demonstrate that Net32 knew or had reason to know that its vendors were engaging in trademark infringement. This finding precludes Dentsply from demonstrating a significantly better than negligible chance at prevailing on the merits of its contributory infringement and unfair competition claims.

### 2. *Knowledge by Net32*

The Third Circuit has not yet developed a standard for assessing knowledge when an online marketplace, such as Net32, supplies a product in the form of a service. In Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93 (2d Cir. 2010), the Second Circuit held that where the product being supplied is a service, a provider will only liable for contributory trademark infringement if they have "[s]ome contemporary knowledge of which particular listings are infringing or will infringe in the future." Id. at 107. "A general knowledge or reason to know that its service is being used to sell counterfeit goods" is insufficient. Tiffany, 600 F.3d at 107. In the absence of Third Circuit guidance, the court finds Tiffany persuasive.

11

The critical question is whether Net32 is cognizant that its vendors offer non-genuine Dentsply products for sale on its website. To be sure, whether the products are non-genuine—or in other words whether the cited differences are considered "material" for purposes of trademark infringement—is not obvious. See Iberia Foods, 150 F.3d at 302-04. The parties engaged in a lengthy period of correspondence during which Dentsply failed to articulate why the products offered for sale on Net32's website were materially different from the products sold by Dentsply's authorized distributors abroad. (See Doc. 2-1 at 12-14, 133-34, 256-58, 382, 390-91; Doc. 24-14; Doc. 24-16; Doc. 24-18; Doc. 24-22; Doc. 24-24). This correspondence together with the current record reveals that although Net32 may have had contemporaneous knowledge that some of the Dentsply products sold by its vendors are *different* from the Dentsply products authorized for sale in the United States, Net32 did not have contemporaneous knowledge of which differences in certain products, if any, are *material*. (See Doc. 2-1 at 12-14, 133-34, 256-58, 382, 390-91; Doc. 24-14; Doc. 24-16; Doc. 24-18; Doc. 24-22; Doc. 24-24; see also Tr. 127:9-13). On this record, the court cannot find that Net32 has or is *knowingly* web-hosting vendors that are engaging in direct trademark infringement through the sale of gray market goods manufactured by Dentsply.

**B. Irreparable Harm**

Irreparable injury is harm of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole. See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Mere risk of injury is not sufficient to meet this

standard. Rather, the moving party must establish that the harm is imminent and probable. Anderson, 125 F.3d at 164. Harm that may be contained effectively only through immediate injunctive relief is properly deemed "irreparable." Instant Air Freight, 882 F.2d at 801. The required showings on irreparable harm and likelihood of success are correlative: thus, the weaker a plaintiff's merits showing, the more is required of the showing of irreparable harm, and vice versa. See Reilly, 858 F.3d at 179 (quoting Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).

Irreparable harm in trademark cases may generally be established by showing loss of control of reputation, loss of trade, or loss of goodwill. See, e.g., Groupe SEB USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 204-05 (3d Cir. 2014) (quoting S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992)). The Third Circuit has made clear that its rejection of the presumption of irreparable harm does "not change the rule that harm to reputation and goodwill constitutes irreparable harm, so long as the plaintiff makes a *clear showing*." Id. at 205 (emphasis added).

A review of Dentsply's indices of customer information and complaints does not indicate that Dentsply has suffered harm to its reputation and goodwill. (See Tr. 84:16-22, 86:23-88:17; see also Net32 Ex. 34). The SIEBEL entries reveal that consumers elect to purchase supplies through Net32 because of lower prices despite their knowledge that Net32 and the majority of its vendors are unauthorized distributors. (See Net32 Ex. 34; see also Tr. 87:11-88:14). A review of the single Trackwise entry that references Net32 signals only that one consumer had a problem "setting up" a product that was purchased on Net32's website and started

13

"adding more liquid" to the product. (See Dentsply Ex. IV.28). Net32's index of customer complaints related to reports of "non-genuine products" also does not suggest that Dentsply has suffered harm to its reputation and goodwill. (See Dentsply Exs. II.1-16; see also Tr. 115:4-116:23).

Dentsply's delay in filing for injunctive relief further erodes the grounds for irreparable harm. A delay caused by a plaintiff's good faith investigative efforts "does not preclude a finding of irreparable harm," BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000), but Dentsply concedes that its delay was a litigation strategy, (Tr. 73:19-74:2). Dentsply has known for at least five years that unauthorized dealers sell Dentsply products on Net32's website that are intended for sale abroad and are different from those authorized for sale in the United States. (See Tr. 29:1-17, 59:15-60:11, 63:4-19, 66:19-67:11, 69:17-24; Doc. 24-8). Dentsply has presented, and the court has found, no reasonable explanation to justify this delay. C.f. Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 726-27 (3d Cir. 2004); Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 169 (3d Cir. 2000). The court concludes that Dentsply has failed to show that it will more likely than not suffer irreparable harm absent the requested relief.[8]

---

[8] The court need not address either of the two remaining factors—the potential for harm to others if relief is granted and whether the public interest favors injunctive relief—because Dentsply has not satisfied either of the gateway factors. Reilly, 858 F.3d at 176, 179.

## V.     Conclusion

Preliminary injunctive relief is an "extraordinary" remedy which should issue only in limited circumstances.  AT&T, 42 F.3d at 1426-27; see also FED. R. CIV. P. 65. We do not find that the present circumstance warrants this extraordinary remedy.

       /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     January 11, 2018